# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AVIGAIL LEWIS BITON, et al.

                                                        01-00382(RMC)

        v.

THE PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY, et al.

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO ENTER JUDGMENT BY DEFAULT AGAINST DEFENDANTS PALESTINIAN AUTHORITY AND PALESTINE LIBERATION ORGANIZATION**

## I.      INTRODUCTION

Pursuant to this Court's order of July 25, 2007, plaintiffs hereby file their Reply in further support of their motion for default judgment, addressing the defendants' argument, raised in their May 31, 2007, Opposition to Plaintiffs' Motion for Entry of Default Judgment, that the Court lacks subject matter jurisdiction under the Anti-Terrorism Act, 18 U.S.C. § 2333.[1]

As shown below, defendants' arguments are baseless, and this case should proceed to default judgment after completion of the damages proceedings before the magistrate judge.

---

[1] Defendants raised several other issues in their Opposition, unrelated to subject-matter jurisdiction. *See* Opposition 18-23, 43-44. In light of the specific language of the Court's order of July 25, 2007, plaintiffs do not address herein the issues unrelated to subject-matter jurisdiction. Plaintiffs note that two of these arguments, which touch upon the non-federal claims brought by the Biton children (i.e. whether the defendants are unincorporated associations and whether Israeli law governs the non-federal claims), are in any event presently before the magistrate judge. *See* Defendants' Objections to Plaintiffs' Proposed Findings of Fact and Conclusions With Respect to Damages. The third issue (defendants' demand to apply § 1608 of the Foreign Sovereign Immunities Act despite their not being foreign states) appears to plaintiffs to be so facially meritless as to not require a response in any case, but plaintiffs will of course respond to that argument if and when the Court requests.

## II.    AVIGAIL BITON AND RACHEL ASRAF ARE NOT SECOND-CLASS CITIZENS

The defendants freely admit that plaintiffs Avigail Biton and Rachel Asraf are citizens of the United States, but argue that they should not be considered nationals of the United States for purposes of the ATA because they are domiciled abroad. Opposition 4-7.

This argument is meritless and should be rejected for numerous reasons:

*First*, defendants' attempt to malign Ms. Biton and Ms. Asraf as not really American because they reside abroad is frivolous and offensive:

> Living abroad, whether the citizen be naturalized or native born, is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance. It may indeed be compelled by family, business, or other legitimate reasons.

*Schneider v. Rusk*, 377 U.S. 163, 168-169 (1964).

Thus, Ms. Biton and Ms. Asraf cannot be dismissed as second-class citizens unworthy of the protections of the ATA. Indeed, in *Schneider v. Rusk* the Supreme Court held unconstitutional a statute that discriminated against citizens domiciled abroad. Therefore, construing the ATA to exclude Americans domiciled abroad, as the defendants demand, would be unconstitutional.

*Second*, defendants' argument flies in the fact of the express language of the statute. The civil action created by § 2333 of the ATA is available to "*Any* national of the United States …". 18 U.S.C. § 2333(a) (emphasis added).

*Third*, the term "national of the United States" within the meaning of § 2333 is defined in § 2331(2) of the ATA, and that same definition applies throughout the criminal provisions of Chapter 113B of Title 18. Thus, adopting defendants' argument would eviscerate the criminal

anti-terrorism provisions of Chapter 113B, and remove from their scope and application terrorist attacks on Americans domiciled abroad.

**Fourth**, defendants' argument, if adopted, would apply with equal force to the anti-terrorism provision of the Foreign Sovereign Immunity Act, 28 U.S.C. § 1605(a)(7). That provision permits American nationals to bring civil actions against designated foreign state sponsors of terrorism for personal injury or death caused by acts of terrorism. 28 U.S.C. § 1605(a)(7).

Many of the judgments entered by this court under § 16057(a)(7) involved American nationals domiciled abroad. *See e.g. Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000); *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C. 1998); *Mousa v. Islamic Republic of Iran*, 238 F.Supp.2d 1 (D.D.C. 2001); *Kerr v. Islamic Republic of Iran*, 245 F.Supp.2d 59 (D.D.C. 2003).

If defendants' argument were accepted, the class of plaintiffs entitled to bring an action under § 1605(a)(7) would also have to redrawn to exclude Americans domiciled abroad.

**Fifth**, defendants' assertion that Ms. Biton and Ms. Asraf can seek relief in an Israeli court (Opposition 4, 6) is nothing but a bad-faith attempt to mislead this Court. The fact is that the instant defendants are currently seeking to dismiss all actions brought against them in Israeli courts by victims of terrorism, on the ground that Israel is ***not an appropriate forum***. *See* Declaration of Daniel Reisner, Adv. ("Reisner") Exhibit 1, at ¶¶ 10-17.[2] Thus, defendants' repeated references to an Israeli forum are thus just a cynical attempt to deceive this Court.

---

[2] In any event, defendants have not actually asserted that this action should be dismissed on *forum non conveniens* grounds, much less demonstrated that the conditions provided in § 2334(d) of the ATA are met by any other forum.

III. **INTERNATIONAL LAW DOES NOT DEROGATE FROM THE COURT'S SUBJECT-MATTER JURISDICTION**

The defendants argue that international law prohibits exercise of U.S. extraterritorial jurisdiction over terrorist attacks not aimed not specifically directed at American citizens, and that the ATA should be construed to conform to international law. Opposition 7-18.

This argument fails both because it misconstrues the relevant principles of international law and because, even assuming *arguendo* that a conflict existed between the language of the ATA and international law, the former trumps the latter.

A. **Under International Law U.S. Courts May Exercise Extraterritorial Jurisdiction Over Actions Arising From Terrorist Attacks in Which U.S. Nationals Are Harmed**

As shown below, the exercise of jurisdiction in this case conforms to both the passive personality and universal theories of jurisdiction under international law.

1. **Passive Personality Jurisdiction**

Defendants assert that under the "passive personality" principle recognized in international law, this Court can exercise subject-matter jurisdiction only when a terrorist attack is directed at a U.S. citizen. Defendants purport to base this argument on § 402 of the Restatement (Third) of the Foreign Relations Law of the United States.

The identical argument was raised in another action pending in this court by the instant defendants' former counsel, Mr. Clark, and was resoundingly rejected by Judge Urbina, who found that terrorist attacks against American citizens implicate the passive personality principle of jurisdiction. *See Wyatt v. Syrian Arab Republic*, 362 F.Supp.2d 103, 115-116 (D.D.C. 2005) (citing *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 15 n. 7 (D.D.C. 1998)).

While the actions in *Wyatt* and *Flatow* were brought under 28 U.S.C. § 1605(a)(7), rather than the ATA, that is a distinction without any difference.

Indeed, *Flatow*, exactly like the case at bar, involved the bombing of an Israeli bus in the Gaza Strip, which was ***not*** directed at the American victim.

Moreover, the Reporter's Notes to § 403 of the Restatement state that:

> The United States in effect applied the "passive personality" principle in a law directed at terrorism, § 1202 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986, 18 U.S.C. § 2231.

*Id*. at Note 3.

Significantly, this provision (formally 18 U.S.C. § 2231) is codified today as 18 U.S.C. § 2332, and is thus the criminal counterpart of the very civil provision (§ 2333) under which the instant action is brought.

Furthermore, this provision – which the Restatement identifies as enshrining passive personality jurisdiction – does ***not*** require that the American victim be intentionally targeted. 18 U.S.C. § 2332. The statute requires only that the Attorney General or his subordinate certify "that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population." § 2332(d). The conference report for this provision states explicitly that:

> The term 'civilian population' includes a general population as well as other specific identifiable segments of society such as the membership of a religious faith or of a particular nationality, to give but two examples. ***Neither the targeted government nor civilian population, or segment thereof, has to be that of the United States***.

H.R. Conf. Rep. 99-783, 1986 U.S.C.C.A.N. 1926, 1986 WL 31900 (Leg.Hist.) at 88 (emphasis added).

Thus, precisely contrary to defendants entire theory here, § 402 of the Restatement cites to a provision which grants extraterritorial jurisdiction over conduct which is **not** specifically directed at Americans, as an example of passive personality jurisdiction as recognized under international law.

The case law follows suit. Thus, for example, in *U.S. v. Hill*, 279 F.3d 731, 740 (9th Cir. 2002), the Ninth Circuit held that the passive personality theory permitted exercise of extraterritorial criminal jurisdiction where the victims of the crime were United States citizens, despite the fact that they were not victimized or targeted because of their U.S. citizenship.

Since exercise of even **criminal** extraterritorial jurisdiction is permitted under the passive personality theory irrespective of whether the conduct was directed at an American, the exercise of merely **civil** jurisdiction – as here – is permitted *a fortiori* in those circumstances. *See Neely v. Club Med Management Services, Inc*. 63 F.3d 166, 185 n. 17 (3rd Cir. 1995) (under passive personality theory extraterritorial civil jurisdiction may be exercised more liberally than extraterritorial criminal jurisdiction).

Defendants cite to several cases applying the passive personality theory where, as it so happened, the victims were targeted as Americans, but none of those cases held that the targeting of Americans is a *sine qua non* of passive personality jurisdiction. Since on the facts of those cases Americans were in fact targeted, no such holding was necessary.

Defendants' citation to *U.S. v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994) is unavailing for several reasons. First, like the Restatement, *Vasquez-Velasco* points to § 2332 of the ATA (then codified as § 2331) as an example of passive personality jurisdiction, and thereby defeats defendants' entire argument here. Second, the comment in *Vasquez-Velasco* quoted by defendants is pure dicta. Third, the Ninth Circuit's later decision in *U.S. v. Hill*, 279 F.3d at 740

overruled *Vasquez-Velasco sub silentio.* Fourth, in *U.S. v. Neil*, 312 F.3d 419, 423 (9th Cir. 2002), the Ninth Circuit expressly repudiated the very dictum in *Vasquez-Velasco* upon which defendants seek to rely.

Tellingly, defendants have not pointed to a single case in which jurisdiction was ***declined*** because an American was not targeted.

### 2. <u>Universal Jurisdiction</u>

Defendants argue that universal jurisdiction does not exist here because there is no agreed definition of "terrorism" under international law. That may be so, but there ***is*** universal jurisdiction over war crimes and crimes against humanity, and defendants' bombing of the school bus in this case constituted both a war crime and a crime against humanity. *See Almog v. Arab Bank*, 471 F.Supp.2d 257 (E.D.N.Y. 2007) (Palestinian bombings of civilians actionable as crimes against humanity despite the absence of agreed definition of "terrorism") *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153, 166 (D.D.C. 2006) ("An armed attack on a civilian bus" violates "established norms of warfare and armed conflict under international law").

Defendants also assert that the United States cannot exercise universal jurisdiction because plaintiffs have an alternative forum in Israel. As discussed *supra*, however, the defendants themselves are contesting jurisdiction in the Israeli courts. *See* Reisner at ¶¶ 10-17. The existence of an Israeli forum is thus at best an uncertainty, and since the defendants actively dispute the jurisdiction of that forum they cannot be now heard to challenge the universal jurisdiction of this court on that ground.

### B. <u>The Plain Language of the ATA Trumps International Law, Assuming Any Conflict Existed</u>

Assuming, *arguendo*, that some conflict existed between the terms of the ATA and international law, there is no question that the former must prevail.

> Customary international law comes into play only "where there is no treaty, and no controlling executive or legislative act or judicial decision." *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see J. Goldsmith & E. Posner, *The Limits Of International Law* 77 (2005) ("political branches have the final say about whether and how [customary international law] applies in the United States and whether or not the United States will comply with it"). ***Never does customary international law prevail over a contrary federal statute***.

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005) (emphasis added).

There are two overwhelming indicia of Congressional intent that foreclose any attempt to bend § 2333 of the ATA to international law:

First, there is not the slightest doubt that Congress intended § 2333 to apply extraterritorially, since "international terrorism" within the meaning of § 2333 is defined as acts that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum". 18 U.S.C. 2331(1)(C).

Second, in § 2331(1)(B), Congress set out a detailed definition of the apparent intent of the conduct actionable under § 2333, which does ***not*** include an intent to harm the United States or to harm American citizens. On the contrary, Congress declared actionable conduct which appears to be intended to intimidate, coerce, influence or affect the conduct of ***any*** civilian population and ***any*** government. 18 U.S.C. § 2331(1).

Since Congress' intent is clear, not one jot should be interpreted out of the clear language of the statute.

## IV. DEFENDANTS REMAIN COLLATERALLY ESTOPPED FROM RE-LITIGATING THEIR SOVEREIGN IMMUNITY CLAIMS

In its Memorandum Opinion of August 22, 2005, this Court held that the defendants are collaterally estopped from asserting a defense of sovereign immunity by the prior decisions in *Ungar v. Palestine Liberation Organization*, 402 F.3d 274 (1st Cir. 2005) and *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424 (S.D.N.Y. 2004), and entered partial summary judgment so holding. *See Biton v. Palestinian Interim Self-Government Authority*, 412 F.Supp.2d 1, 4-5 (D.D.C. 2005).

Defendants now claim that subsequent to this Court's 2005 decision there have been "material changes to controlling facts" which "preclude application of the collateral estoppel doctrine". Opposition at 25-26.

Specifically, defendants argue that implementation of Israel's Disengagement Plan, and a decision of an Israeli judge finding that the PA enjoys immunity under Israeli law, constitute a "material change in controlling facts and law" in light of which "it would be inappropriate to apply collateral estoppel" to defendants' immunity claims. Opposition at 26.

As will be demonstrated below, neither the implementation of the Disengagement Plan nor the Israeli decision detract one iota from the holdings in *Ungar* and *Knox*.

However, the Court need not even consider whether the Disengagement Plan or the Israeli decision derogate from *Ungar* and *Knox*, because there are several threshold barriers to revisiting this Court's 2005 decision on immunity.

Accordingly, we will address these threshold issues before proceeding to the substance of defendants' claims regarding the purported change in circumstances.[3]

### A.    Foreign State Status Is Determined at the Time of Filing Suit

The Supreme Court has made clear that the determination of whether a defendant has "foreign state" status, like all other factual predicates of subject-matter jurisdiction, is relevant only to <u>the time the suit is filed</u>. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (noting "the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought. It is well settled, for example, that federal-diversity jurisdiction depends on the citizenship of the parties at the time suit is filed") (internal quotations and citations omitted).

Thus, <u>precisely contrary</u> to defendants' position, a sovereign immunity claim is <u>not</u> open to reconsideration in light of alleged changes in circumstances. Rather, the examination of a defendant's claim to "foreign state" status, and of the court's subject-matter jurisdiction over the action against that defendant, relates to only one point in time – the date the suit was filed.

This action was filed in 2001, long <u>prior</u> to the decisions in *Ungar* and *Knox* (given on April 23, 2004, and March 1, 2004, respectively) rejecting defendants' immunity claim.

Thus, the decisions in *Ungar* and *Knox*, which found that no Palestinian state had come into existence as of March/April 2004, per force reflected "the state of things at the time of the action brought" by the instant plaintiffs, in 2001. *Dole Food*, 538 U.S. at 478.[4]

---

[3] Plaintiffs address these threshold barriers to revisiting the immunity issue before discussing the substance of defendants' claim that there has been a relevant change in circumstances, only because that is the logical way to proceed (i.e. threshold issues before substantive issues), and **not** because there is any merit whatsoever to defendants' assertions.

[4] In fact, the decision of the First Circuit in *Ungar*, which analyzed defendants' statehood claim *de novo* and in detail, and rejected it, was entered on March 31, 2005.

Therefore, the defendants' entire argument here is a *non sequitur*: since the Court has determined that the defendants were not "foreign states" and that subject-matter jurisdiction thus existed at the time this action was filed (and as of 2005), no subsequent change in circumstances can possibly affect that jurisdiction.

B.      The United States Still Does Not Recognize a State of Palestine

The decisions in *Knox* and *Ungar*, which analyzed and rejected defendants' sovereign immunity claim on the merits and which underlie the subsequent finding of collateral estoppel made by this Court, based their rejection of the sovereign immunity claim <u>both</u> on the finding that the defendants do not meet the four recognized criteria of statehood <u>and on the wholly independent and alternate ground</u> that a sovereign immunity defense is unavailable to the defendants because they are not recognized as a "foreign state" by the Executive Branch. *See Knox*, 306 F.Supp.2d at 438-448 ("even if Defendants presented sufficient evidence that Palestine and the PA and PLO regime satisfy the criteria for statehood, this Court would decline to give effect to the foreign state and governmental immunities Defendants invoke" because the Executive Brach does not recognize a Palestinian state.); *Ungar*, 315 F.Supp.2d at 186-187 ("Even assuming, without deciding, that a State of Palestine exists, the PA and PLO are still not entitled to sovereign immunity because there is no evidence that the United States has recognized or otherwise treated Palestine as a sovereign state.")

Thus, even assuming purely *arguendo* that there had been some recent change in circumstances that brought the defendants within the quadripartite definition of statehood (which, as shown below, there has not), and further assuming that such a change could have some relevance at this stage of the proceedings (which, as shown above, it cannot), the

defendants could not even <u>attempt</u> to relitigate their immunity claim in this Court unless they could <u>also</u> demonstrate that the Executive Branch has now recognized a Palestinian state.

Simply put, unless and until defendants can show that there has been such Executive Branch recognition, they are and will remain estopped by the holdings in *Ungar* and *Knox* that the absence of such recognition precludes any claim of sovereign immunity, and cannot even <u>begin</u> to demand any reexamination of this claim – irrespective of any <u>other</u> purported change in circumstances.

Of course, defendants do not even attempt to argue that the United States has recognized a Palestinian state because it has not.[5] Indeed, in *Estate of Klieman v. Palestinian Authority*, another judge of this Court rejected an identical attempt by defendants to vitiate *Ungar* and *Knox*, precisely on this ground: "Although the Court can conceive of circumstances under which it would be reluctant to apply the doctrine of collateral estoppel to bar defendants' assertion of sovereign immunity – for example, if the United States government now recognized Palestine as a sovereign nation – defendants have presented no compelling reason why they should be permitted to re-litigate these already decided issues in this case". *Estate of Klieman*, 424 F.Supp.2d 153, 160 (D.D.C. 2006).

Therefore, the defendants remain collaterally estopped by the decisions in *Ungar* and *Knox* irrespective of any purported changes in circumstances relating to the four-part objective

---

[5] The position of the United States is that set forth in the "Performance-Based Roadmap to a Permanent Two-State Solution to the Israeli-Palestinian Conflict" of April 30, 2003. *See* http://www.state.gov/r/pa/prs/ps/2003/20062.htm. The Roadmap does not recognize the existence of a Palestinian state. *See Gilmore v. The Palestinian Interim Self-Government Authority*, 422 F.Supp.2d 96, 101 n. 2 (D.D.C. 2006) ("The 'Roadmap,' …was written on the premise that a 'state' of Palestine does not exist"). On the contrary, the Roadmap requires the PA to fulfill a series of benchmarks – primarily relating to fighting terrorism – as a condition of even **proceeding** toward statehood. *Id*. None of these conditions have been met, nor have any of the International Conferences anticipated by the Roadmap been held. If this Court were to recognize defendants' claim to statehood, it would undermine the Executive Branch's foreign policy interest in requiring the defendants to comply with the benchmarks and obligations set forth in the Roadmap. "Such a ruling not only would have constitutive effect imbued with domestic legal consequences, but run directly counter to the executive branch's declared public policy of nonrecognition of Palestine and the PLO." *Knox v. Palestine Liberation Organization*, 306 F.Supp.2d 424, 447 (S.D.N.Y. 2004)

test for statehood, and there is thus no ground whatsoever to disturb this Court's 2005 decision rejecting defendants' statehood and immunity claims.

### C.    The Oslo Accords Remain in Force

The *Ungar* and *Knox* courts rejected defendants' claim to meet the four-part test of statehood because the PA's constituent instrument, the Oslo Accords, severely limits the powers of the PA, which limitations those courts enumerated and analyzed in detail. *See Ungar*, 315 F.Supp.2d at 177-186; *Ungar,* 402 F.3d at 291-292; *Knox*, 306 F. Supp. 2d at 433-438.

Thus, in order to demonstrate that there has been a change in circumstances that renders *Knox* and *Ungar* obsolete, defendants would have to assert and show – and this Court would have to find – that there has been a change in the provisions of the Oslo Accords.

Defendants make no such claim because they cannot. The Oslo Accords have not been modified, much less abrogated, since the decisions in *Ungar* and *Knox*. Indeed, as recently as September 5, 2006, defendants themselves informed this Court that:

> The Palestinian Authority … is specifically prohibited by its founding charter from engaging in foreign relations and maintaining foreign offices. See e.g. Article VI of the Agreement on the Gaza Strip and Jericho, dated May 4, 1994: "2.a. In accordance with the Declaration of Principles, The Palestinian Authority will not have powers and responsibilities in the sphere of foreign relations...".

Defendants Memorandum in Reply to Plaintiffs Opposition and in Further Support of Defendants Rule 12(b) Motion, filed on September 5, 2006, in *Klieman v. Palestinian Authority*, Civ. No. 04-11173 (PLF) (D.D.C.), Exhibit 2, at 1-2 (emphasis added).

The "Agreement on the Gaza Strip and Jericho" referred to here by defendants as the PA's "founding charter" is part of the Oslo Accords. *See Ungar*, 402 F.3d at 287; *Knox* 306 F. Supp. 2d at 433.

Moreover, the limitation on foreign relations capacity which the defendants here admit is still in force today – in a pleading filed by them on September 5, 2006 – is sufficient, standing alone, to doom defendants' claim to statehood, because the capacity to conduct foreign relations is one of the four cumulative conditions for statehood under international law, as discussed at length in *Ungar* and *Knox. See Ungar*, 315 F.Supp.2d at 181-182; *Ungar,* 402 F.3d at 287; *Knox* 306 F. Supp. 2d at 438.

Indeed, in *Gilmore*, once the court determined that the defendants lack capacity to conduct foreign relations, it decided that there was no point in even examining the other cumulative conditions of statehood:

> Defendants fail to establish that Palestine has the capacity to engage in formal relations with other sovereign states. …
>
> In light of Defendants' failure to satisfy one of the criteria for statehood, it is not necessary for the Court to examine Plaintiffs' remaining arguments for why Palestine does not possess the attributes of statehood as outlined in the Restatement.

*Gilmore* 422 F.Supp.2d at 101.

This Court, too, need go no further. Defendants' admission on September 5, 2006 – long *after* the Disengagement and entry of the Israeli decision which defendants now allege to have affected their status – that the PA still lacks the capacity to conduct foreign relations (a lack of capacity which *Knox* and *Ungar* correctly found to defeat statehood) clearly shows that defendants remain estopped by the holdings in *Knox* and *Ungar*.

Therefore, defendants' demand that this Court revisit their statehood claim is not only baseless but frivolous, since the limitations on the PA's capacities set forth in the Oslo Accords,

which limitations the *Ungar* and *Knox* courts found to negate any claim to "foreign state" status, are still in force – as defendants themselves have expressly admitted to this Court.[6]

***

For the reasons stated above, defendants' attempt to relitigate their statehood and immunity arguments can and should be rejected <u>summarily</u>.

## V.    NEITHER IMPLEMENTATION OF THE DISENGAGEMENT PLAN NOR THE DECISION IN *ELON MOREH* DETRACT FROM THE PRECLUSIVE EFFECT OF *UNGAR* AND *KNOX*

Defendants cite *Montana v. United States*, 440 U.S. 147, 155, 159 (1979) for the rule that "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues", and argue that implementation of Israel's Disengagement Plan and the decision in *Elon Moreh* constitute such "changes in facts essential to" *Ungar* and *Knox*. Opposition at 26-30.

As shown below, this argument is baseless.

### A.    The Disengagement Plan

Defendants claim that the implementation of Israel's Disengagement Plan in September 2005, increased the PA's governmental control in the West Bank and Gaza beyond that which obtained at the time of *Ungar* and *Knox*, and gave the PA the sovereign governmental control necessary for statehood which *Ungar* and *Knox* found lacking.

---

[6] The argument made by defendants in their memorandum in *Klieman*, i.e. that their lack of capacity to conduct foreign relations means that they cannot have a presence in the United States for "minimum contacts" purposes, was made by them in *Ungar* and expressly rejected by that court. *See Ungar*, 325 F.Supp.2d at 54 (rejecting the identical argument, and finding that "while the PA is prohibited from conducting 'foreign relations' … there is nothing in the Oslo Accords, as Plaintiffs point out, which prohibits the PA 'from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad' … It is precisely these types of activities which have caused this court to find that both the PA and PLO have sufficient minimum contacts with the United States to allow the exercise of personal jurisdiction. Thus, the fact that the PA cannot conduct foreign relations does not mean that it cannot have minimum contacts with the United States. As Plaintiffs note, there are thousands of individuals and corporations, which like the PA are unable to conduct foreign relations, but which have sufficient minimum contacts with this country to allow the exercise of personal jurisdiction over them.") (internal cite omitted).

This argument fails for multiple reasons:

**<u>The West Bank</u>**

The sole impact of the Disengagement Plan in the West Bank was the evacuation of some 200 Jewish families from four small settlements. *See* Declaration of Brigadier-General Yosef Kuperwasser, Exhibit 3 ("Kuperwasser") at ¶¶ 27-38. The area of those settlements remains under the exclusive authority and control of Israel, Israeli forces continue to operate there freely, and the PA has no presence – much less control – therein. *See* Kuperwasser at ¶¶ 34-38. *See also* Reisner at ¶¶ 18-21.

Defendants' repeated claim throughout their Opposition that Israel "withdrew" from part of the West Bank as part of the Disengagement and handed it over to the PA, is thus blatantly false.

Moreover, since fall 2000 the PA has not exercised in the West Bank even the limited powers it enjoys under the Oslo Accords, and since spring 2002 it has been unable to exercise those powers. *See* Kuperwasser at ¶¶ 27-33.

Indeed, the PA does not exercise effective authority ***anywhere*** in the West Bank today: since April 2002, Israel has been deployed throughout the West Bank and continues today to operate freely therein – including in Area A, where the PA has its maximum powers under the Oslo Accords. *Id.*

Notably, the analyses in *Ungar* and *Knox* of the PA's authority were based on the provisions of the Oslo Accords, and <u>assumed</u> that the PA did in fact exercise the powers granted to it in those provisions. *Ungar* and *Knox* found that the PA's powers under Oslo, even if exercised in full, did not rise to statehood. Yet, as Brigadier-General Kuperwasser has explained,

the fact is that the PA has not exercised even those limited powers for the past seven years – and the Disengagement has done nothing at all to change that. *Id*.

### **The Gaza Strip**

Defendants' arguments regarding implementation of the Disengagement Plan in the Gaza Strip have been mooted by recent events: it is a matter of public record that in June 2007, the PA was driven out of Gaza by Hamas, and today exercises no authority or power in Gaza whatsoever. *See* Kuperwasser at ¶¶ 23-26.[7]

Thus, today the PA has <u>no governmental control at all</u> over the territory or population of the Gaza Strip, and defendants' claim that the PA meets the "sovereign control" requirement of statehood in Gaza should be dismissed summarily as moot.

Nor can the defendants claim with a straight face that they achieved sovereign control in the Gaza Strip between September 2005 (when the Disengagement was implemented) and June 2007 (when the PA lost its foothold in Gaza). As Brigadier-General Kuperwasser explains, the PA never succeeded in taking control over the areas of Gaza evacuated by Israel in September 2005, and, moreover, the implementation of the Disengagement Plan triggered a severe, progressive <u>deterioration</u> in the PA's already-weak authority within the Gaza Strip, which culminated in the Hamas coup in June 2007. *See* Kuperwasser at ¶¶ 12-26.

Indeed, even the briefest survey of the undisputed public record easily demonstrates that the PA's authority in Gaza only <u>weakened</u>, and that chaos and anarchy set in, following the Disengagement:

On September 15, 2005, the chairman of the PA complained of "the security anarchy, the armed chaos" plaguing Gaza. Exhibit 4.

---

[7]  The Washington Post and New York Times have reported almost daily since June 2007 on the PA's loss of Gaza and its aftermath.

The same day, the Washington Post noted that "the Gaza Strip is on the verge of anarchy." Exhibit 5.

On September 21, 2005, the head of Israel's security service warned that the "Palestinian Authority is crumbling". Exhibit 6.

On October 17, 2005, the New York Times reported in detail on the "disintegration of the Palestinian Authority". Exhibit 7.

On November 23, 2005, "a senior Palestinian Authority official … admitted that the PA has failed to take control of the former settlements in the Gaza Strip" and that local gangs and clans were in control. Exhibit 8. Officials of the PA made similar statements on November 2, 2005. Exhibit 9.

Likewise, the Palestinian Centre for Human Rights repeatedly reported on the "security chaos" and the "chronic failure" of the PA to exercise governmental control in Gaza. Exhibits 10, 11, 12, and 13.

On December 16, 2006, Secretary of State Rice noted the "lawlessness that is there in the Gaza, which largely derives from Hamas's inability to govern." Exhibit 14.

On December 19, 2006, a PA governmental official described the situation in Gaza as "anarchy". Exhibit 15.

Furthermore, the <u>defendants themselves</u> openly assert – outside the four corners of their court papers – that the Disengagement effected no change in the status of the Gaza Strip. Thus, the PLO has published a detailed legal analysis explaining that Israel's withdrawal from the Gaza Strip did not change its legal status as "occupied" territory. Exhibit 16.[8]

---

[8] This document was downloaded by plaintiffs' counsel from the official PLO website (www.nad-plo.org/inner.php?view=facts_gaza_GAZA%20STILL%20OCCUPIED) in December 2006.

Defendants' argument before this Court is thus made in gross bad faith, since it contradicts their own official statements.

In sum, it is patently obvious that the PA not only failed to achieve sovereign control in Gaza following the Disengagement but, on the contrary, lost even the limited authority it had exercised before September 2005.[9]

In this regard it should be noted that, even prior to the Disengagement, the PA was unable to exercise in the Gaza Strip even the limited powers granted to it under the Oslo Accords. *See* Kuperwasser at ¶ 16. Thus, as in the West Bank, the PA's ***actual*** measure of authority in Gaza prior the Disengagement was even less than that granted it under Oslo – which authority the *Ungar* and *Knox* courts assumed the PA actually exercised but nonetheless found insufficient to meet the "control" requirement for statehood.

In sum: the Disengagement provides no basis whatsoever to revisit the holdings in *Ungar* and *Knox*; on the contrary, the PA is further than ever today from the "sovereign governmental control" required as a condition of statehood. *Ungar*, 315 F.Supp.2d at 180.

Furthermore, as noted above and as discussed in detail in *Knox* and *Ungar*, the extent of the PA's authority is limited as a matter of law by its constituent instrument, the Oslo Accords. Thus, in order to prove that the PA exercises sovereign governmental powers anywhere,

---

[9] The burden to prove the elements of statehood rests on the defendants. *Ungar*, 402 F.3d at 289 ("[T]he party who alleges sovereign immunity has the burden of proving that status"). Thus, the burden is on the defendants to make a factual showing that there has been some relevant change in the facts since the decisions in *Knox* and *Ungar*. In support of their claim that the PA exercised sovereign control over Gaza following Israel's Disengagement, the PA cites only the communiqué from the Israeli army stating that following the Disengagement the PA would bear sole responsibility for security and order in Gaza. Opposition at 28.

This communiqué is of no moment, in the first place, because it did not, and did not purport to, transfer any authority to the PA, but rather merely conveyed Israel's demand that the PA prevent terrorist activity emanating from Gaza. *See* Reisner at ¶¶ 23-25.

More importantly, the Israeli communiqué says nothing about whether the PA ever actually ***succeeded*** in exerting any control over the Gaza Strip following the Disengagement. The defendants submitted no evidence in this regard, because none exists.

defendants would have to prove (which they cannot) that the Oslo Accords have been modified or abrogated. Not only do defendants make no such claim, but in the papers filed by them on September 5, 2006, in *Klieman* (Exhibit 2) defendants confirm the continued force of the Oslo Accords. *See also* Reisner at ¶ 25.

Additionally, the Oslo Accords provide that the parties "view the West Bank and Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period", and that "Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations." Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, 36 I.L.M. 551, at Articles XXXI(7) and  XXXI(8).

Thus, in asking this Court to find that "the status of the West Bank and the Gaza Strip" has changed, defendants are effectively inviting this Court to breach the provisions of the Oslo Accords, and to prejudge the outcome of the "permanent status negotiations" which have not yet occurred. The Court should firmly decline that invitation.

### B.        The *Elon Moreh* Decision

Defendants' attempt to challenge to the preclusive effect of *Ungar* and *Knox* on the basis of the Israeli decision in *Elon Moreh* is meritless for multiple reasons:

***First***, as a threshold matter of law, the issuance of the Israeli district court decision in *Elon Moreh* cannot constitute a "change in material facts" which could potentially negate the application of collateral estoppel. At the very most, that decision could have been proffered by defendants – had it been given prior to the decisions in *Ungar* and *Knox* – as foreign authority in support of the ***merits*** of defendants' statehood argument.

But that is exactly the point of this Court's August 2005 decision: the *merits* of defendants' statehood argument have already been determined in *Ungar* and *Knox*, and can no longer be contested. The fact that an Israeli judge subsequently issued an opinion reaching a different conclusion is not a change in the "facts" essential to *Ungar* and *Knox* and thus, as a matter of law, *Elon Moreh* cannot not affect the preclusive effect of *Ungar* and *Knox*.

A *clear* change in *controlling* law can sometimes negate the application of collateral estoppel. *See generally North Georgia Elec. Membership Corp. v. City of Calhoun, Ga.*, 989 F.2d 429, 433-435 (11th Cir. 1993) (collecting and analyzing cases). Here, however, it is patently obvious that there has been no change whatsoever in the *controlling law of the United States*. The decision in *Elon Moreh* is a foreign opinion applying foreign law issued by a single judge of a lower court in a foreign country, and is not even persuasive – much less controlling – authority in the courts of the United States.[10]

Therefore – as a threshold matter of law – the *Elon Moreh* decision *cannot* derogate from the preclusive effect of *Ungar* and *Knox*. Indeed, on the contrary, *Ungar* and *Knox* estop the defendants from seeking to rely on *Elon Moreh*, and their attempt to do so flies in the face of this Court's decision of August, 2005.

Accordingly, all of defendants' arguments based on *Elon Moreh* should be dismissed out of hand as precluded by *Ungar*, *Knox* and this Court's 2005 decision, and the Court can and should end its inquiry here.

*Second*, notwithstanding defendants' best efforts at selective quotation, *Elon Moreh* clearly did *not* find that the PA meets the quadripartite definition of statehood under international law. On the contrary, Judge Okun specifically stated that he was not determining whether the PA is a state:

---

[10]  Moreover, as shown below, *Elon Moreh* is not controlling authority – indeed is not good law – even in Israel.

> There is no need to consider, in the case at hand, the question of the exact legal status of the said Palestinian Authority. It is a complicated matter.

*Elon Moreh* at ¶ 8.

Moreover, Judge Okun specifically held that:

> [T]he [Palestinian] Authority was not granted all of the powers accorded to a sovereign.

*Id.*

Since the PA "was not granted all of the powers accorded to a sovereign" it is not a "foreign state" under the law of the United States and so not entitled to immunity in this Court (irrespective of whatever immunities it might enjoy under *Israeli* law). Thus, *Elon Moreh* actually constitutes authority in support of *Ungar* and *Knox*.

**Third**, *Elon Moreh* is based on law and grounds unique to Israel that are completely inapposite in a United States court. The finding of immunity is based in the main on the relationship between Israel and the PA sketched in the Oslo Accords, and on the domestic statute enacted by Israel to implement the Oslo Accords. *See e.g. Elon Moreh* at ¶ 3; ¶ 8 ("it is clear that the Interim Agreement changed the status of the Palestinian Authority in *Israeli* law") (emphasis added); ¶10 ("even if full sovereignty has not been recognized, the Interim Agreement adopts, as a matter of practice, *in relations between Israel and the Palestinian Authority*, the rule in customary international law according to which 'an equal has no authority over an equal'") (emphasis added); ¶ 12 ("The application of immunity to the Palestinian Authority is also derived from a reading of the aims of the Interim Agreement *and the Implementing Law*") (emphasis added).

Obviously, these grounds are all entirely irrelevant in a United States court.

Furthermore, the immunity analysis applied in *Elon Moreh* bears no relationship to the four-part test for statehood recognized under international and United States law. Indeed, Judge Okun emphasized that "The application of this rule [of immunity] has nothing to do with the answer to the question of whether the Palestinian Authority constitutes a state." *Id.* at 12. Rather, Judge Okun applied a "functional approach" to immunity that looks ***not*** to the status of the entity – i.e. whether it is a foreign state – but to whether it performs some governmental functions. *Id.* at 11.

Clearly, the legal principles underlying *Elon Moreh* are wholly foreign to the law of the United States.

***Fourth***, as explained by international law expert Daniel Reisner (who was one of the primary negotiators and drafters of the Oslo Accords), *Elon Moreh* is riddled with glaring errors of fact and law. *See* Reisner at ¶¶ 26-51.

The most egregious of these mistakes is Judge Okun's erroneous "finding" that the PA was a party and a signatory to the Oslo Accords, and therefore conducts foreign relations. *See* Reisner at ¶¶ 28-31. In fact, the Palestinian party to the Oslo Accords was not the PA but the PLO. *Id.*

Thus, the defendants' attempt to rely on *Elon Moreh* as authority for their claim that the PA conducts foreign relations (Opposition at 35) rests on a demonstrable error of empirical fact.

The surprising number of errors in *Elon Moreh* is probably attributable to the fact that the decision was entered *sua sponte*, and without any briefing or submission of evidence by the parties. *See* Declaration of Avraham Colthof, submitted as an exhibit in *Klieman v. Palestinian Authority*, Civ. No. 04-11173 (PLF) (D.D.C.) (dkt. #57) Exhibit 17, at ¶ 19.[11]

---

[11] The pleadings in *Klieman* indicate that this declaration was filed in response to an attempt by the instant defendants to rely on *Elon Moreh* in *Klieman*. *See id.* dkt. #57.

*Fifth*, *Elon Moreh* contradicts a preclusive panel decision of the same Israeli court which was recently affirmed by the Israeli Supreme Court and *Elon Moreh* was therefore never good law even in Israel. *See* Reisner at ¶¶ 40-50.

Thus, defendants' claim (Opposition at 30) that *Elon Moreh* "provides a clear affirmation of the Israeli Judiciary's view of the status of the PNA" is utterly baseless. In fact: "The decision in *Elon Moreh* reflects nothing more than the opinion of a single judge of a lower court, which is squarely contradicted by" other, superior Israeli authority. Reisner at ¶ 49.

Accordingly, for the reasons stated above, *Elon Moreh* provides no grounds whatsoever to disturb the preclusive effect of *Ungar* and *Knox*.

## VI.    DEFENDANTS' IMMUNITY ARGUMENTS ARE PRECLUDED

On pages 30-39 of their Opposition, defendants argue at length that they enjoy sovereign immunity from the instant action.[12]

Because, as shown above, defendants have not demonstrated any change in material facts that would derogate from the preclusive effect of *Ungar* and *Knox*, defendants remain estopped by this Court's decision of August 2005 from asserting a claim to statehood or sovereign immunity. Accordingly, all of defendants' arguments in this regard are precluded and so nugatory, and must be disregarded.

## VII.    THE PA IS NOT A POLITICAL SUBDIVISION OF THE STATE OF ISRAEL

Defendants' claim in the PA is a "political subdivision" of the State of Israel (Opposition at 40-43) is entirely baseless.

---

[12] Defendants' immunity claims rely entirely on a hodge-podge of arguments already considered and rejected in *Ungar* and *Knox*, along with arguments based upon the Disengagement and *Elon Moreh* which, as shown above, have no basis in reality.

In the first place, the identical argument has been rejected by both the Israeli government and the Israeli Supreme Court, which found – as a matter of internal Israeli law – that the PA is not a political subdivision, agency or instrumentality of Israel. *See* Reisner at ¶¶ 52-61.

It would be absurd, to say the least, for a U.S. court to find that an entity is a political subdivision of a foreign state (here: Israel), when the government of that foreign state disputes that the entity is such, and when the Supreme Court of that foreign state has ruled to the contrary.

Moreover, defendants' entire argument here is built on the faulty either-or premise that since the PA was granted certain powers by the occupier in the West Bank and Gaza, it must either be a full-blown state or a part of the State of Israel. Defendants cite no authority for this proposition, because there is none, and simply repeat that it "must" be the case. Opposition at 40, 41.

But defendants never explain why a third-party entity cannot be delegated powers in an occupied territory, without becoming a "political subdivision" of the occupier? Imagine, for example, that the United States delegated certain governmental powers in occupied Iraq (e.g. health and education) to a charitable organization or to an agency of the UN: would that render the organization or UN agency a "political subdivision" of the United States?! Hardly.

## VIII.    CONCLUSION

Plaintiffs' motion should be granted, after the magistrate judge has issued his report and recommendation on damages.

Plaintiffs, by their Attorneys,

/s/ David J. Strachman
David J. Strachman
D.C. Bar No. D00210
McIntyre, Tate & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

    I here by certify that on September 18, 2007, this document and exhibits thereto were served via ECF to the following counsel of record:

Richard A. Hibey
Mark J. Rochon
Charles F. B. McAleer, Jr.
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701

                                        /s/David J. Strachman